UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES,

v.

ANDRES AGUIAR,

                Defendant.

**MEMORANDUM & ORDER**
91-CR-00779 (HG)

---

**HECTOR GONZALEZ**, United States District Judge:

    Following Defendant Andres Aguiar's[1] convictions for drug trafficking and witness tampering, he was sentenced to multiple life terms of imprisonment. Having served 33 years of that sentence, Defendant, now 62 years old, seeks compassionate release under the First Step Act. 18 U.S.C. § 3582(c)(1)(A). The Government does not oppose his resentencing. Undoubtedly, and as Defendant acknowledges, his criminal conduct and history were gravely serious. His lawbreaking endangered his community, law enforcement, and the very administration of justice. But his punishment no longer fits his crimes nor him as an individual. *See Pepper v. United States*, 562 U.S. 476, 487–88 (2011). No theory of punishment justifies his continued incarceration. Because there are extraordinary and compelling reasons warranting a reduction in his sentence, and Defendant has satisfied all other statutory requirements, the Court grants his motion for a sentence reduction, and reduces his three life terms of imprisonment on the drug counts to time served on each.

## FACTUAL BACKGROUND

    Following a jury trial, Defendant was convicted of conspiracy to import heroin, 21 U.S.C.

---

[1]     Defendant's true name is Henry Delgado, but the Court will, like his counsel and the Government, refer to him by the name Andres Aguiar for consistency with court and Bureau of Prisons records.

§ 963; importing heroin into the United States, *id.* §§ 952(a), 960; possession with intent to distribute heroin, *id.* § 841(a)(1); and witness tampering, 18 U.S.C. § 1512(b)(1). *See United States v. Aguiar*, 975 F.2d 45, 46 (2d Cir. 1992). The Second Circuit has previously summarized the underlying criminal conduct:

> On June 25, 1991, George Albino was arrested at John F. Kennedy Airport when heroin was found in his luggage. Albino agreed to cooperate and told authorities that he was to deliver the narcotics to a "Henry" in the public area of the International Arrivals Building. (A subsequent check revealed that Aguiar was also known as Henry Delgado.) Equipped with a concealed tape recorder, Albino approached Aguiar. Aguiar asked in Spanish if everything was okay and where the bag was. Albino responded affirmatively, and Aguiar then picked up the suitcase containing the heroin and was shortly arrested.
>
> Albino subsequently entered into a plea agreement. He was interviewed pursuant to this agreement by Joint Narcotics Smuggling Unit Special Agent Peter Amentas and Assistant United States Attorney Andrew Weissmann. Albino stated that Aguiar had hired him to go to Brussels to obtain the heroin. Aguiar had made Albino's travel arrangements, obtained his passport, paid his expenses, and agreed to pay him five to six thousand dollars upon delivery of the heroin. Albino also stated that, after the arrest, Aguiar told him to deny everything and to say that Aguiar was just a taxi driver.
>
> On October 3, 1991, however, Albino told the government that he no longer wanted to cooperate. The following day he changed his mind again and explained that he had received written and verbal threats from Aguiar. He also expressed concern about his family's welfare. Albino gave Amentas one of the letters he had received from Aguiar. That letter threatened to expose criminal conduct by Albino, including murder. It urged Albino to "act quick and contact [his] lawyer to clear" Aguiar.
>
> On October 7, Albino again refused to cooperate and withdrew from his plea agreement. On October 11, pursuant to a search warrant, agents found two threatening letters in Albino's cell. The first letter was from "a very good friend of Andy" who wrote that Albino would be convicted of murder and that other prisoners would be told that Albino was an informer. The second letter, which was unsigned but contained Aguiar's fingerprints and is thus attributable to him, stated that if Albino cleared Aguiar, Albino would not have to worry about the evidence of his state crimes. The letter also advised Albino to falsify his testimony, or so the jury could easily have found. Albino, even though he was granted immunity and faced civil and criminal contempt charges, refused to testify for the government or in Aguiar's defense.

*Id.* at 46–47.[2]

After Defendant was convicted, Judge Johnson sentenced him. Defendant had an offense level of 34 and, because he had multiple prior criminal convictions, a criminal history category of V. ECF No. 92 at 19 (Presentence Report; "PSR").[3] Under the then-mandatory Sentencing Guidelines, that would have resulted in a sentence of 235 to 293 months. ECF No. 122 at 8 (Defendant's Motion). However, two of Defendant's prior convictions were for crimes of violence. At age 16, he and others committed an armed robbery of a liquor store, for which he was convicted. PSR ¶ 31. And at age 19, he was arrested again and later convicted of criminal possession of a weapon and attempted assault. *Id.* ¶ 33. Those predicate convictions made him a career offender for the purpose of determining his sentence on the instant charges, *see* U.S.S.G. § 4B1.1, increasing his adjusted offense level to 37 and his criminal history category to VI, PSR ¶ 28. This significantly increased his maximum exposure, which now stood at a mandatory Guidelines range of 360 months to life. *Id.* at 19.

On March 17, 1992, Defendant was sentenced to four concurrent life terms on the drug and witness tampering charges. ECF No. 40. Because the life sentence on the witness tampering conviction exceeded the statutory maximum, on March 23, 1992, the Court altered Defendant's sentence and ordered him to serve three concurrent life terms of imprisonment on the drug convictions and a concurrent 120-month term on the witness tampering conviction. ECF No. 41. The Second Circuit affirmed. *See Aguiar*, 975 F.2d at 48. On July 24, 1998, Judge Johnson denied Defendant's motion for a new trial, *Aguiar v. United States*, No. 91-cr-0779, 1998 WL 422855 (E.D.N.Y. July 24, 1998), as well as two *habeas corpus* petitions brought pursuant to 28

---

[2]  Unless noted, case law quotations in this Order accept all alterations and omit internal quotation marks, citations, and footnotes.

[3]  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

U.S.C. § 2255, *Aguiar v. United States*, No. 01-cv-4117, 2010 WL 1608113 (E.D.N.Y. Apr. 16, 2010); ECF No. 109.  Defendant has no scheduled release date.  ECF No. 122 at 7.

On January 8, 2021, Defendant petitioned the warden of United States Penitentiary Victorville for compassionate release.  *See* ECF No. 111-1 at 3–14.  The warden received the petition on January 27, 2021, and denied it on May 5, 2023.  *See id.* at 3, 16–18.  Proceeding *pro se*, Defendant filed a motion for compassionate release under the First Step Act on August 31, 2023.  ECF No. 111 (*Pro Se* Motion).  On October 25, 2023, the case was reassigned to me, and I directed the Government to respond.  *See* Oct. 25, 2023, Text Order; ECF No. 112.  On December 6, 2023, the Court granted the Government additional time to respond.  *See* ECF No. 115.  And on January 12, 2024, the Government sought an additional extension of time to respond and suggested that the Court appoint counsel for Defendant.  ECF No. 116 at 1–2.  The Court appointed Defendant's current counsel and granted an extension of time to the Government.  *See* Jan. 12, 2024, Text Order.  On March 28, 2024, Defendant, now aided by counsel, filed a motion in support of his *pro se* motion.  *See* ECF No. 119 (Unredacted Motion); ECF No. 122.  On April 25, 2024, the Court granted the Government a final extension of time to respond.  *See* ECF No. 120; Apr. 25, 2024, Text Order.  The Government filed its response on May 21, 2024, stating that it "does not oppose the defendant's resentencing." ECF No. 121 at 1 (Government's Response).  However, the Government requested that the Court direct "the Probation Department to submit a revised [PSR]" and give the parties an "opportunity to provide briefing regarding an appropriate sentence" if the Court grants Defendant's motion.  *Id.*  On May 28, 2024, the Court held a conference with the Government and Defendant's counsel to discuss the motion.  *See* May 28, 2024, Text Order.

4

## **LEGAL STANDARD**

Section 3582(c)(1)(A) provides that, once a defendant has "fully exhausted all administrative rights," the Court may reduce his sentence "after considering the factors set forth in [18 U.S.C. §] 3553(a) if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." In *United States v. Brooker*, the Second Circuit held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F.3d 228, 237 (2d Cir. 2020). Indeed, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason." *Id.* at 237–38.

Some of the factors to be considered under Section 3553(a) include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities. Section 1B1.13 of the recently updated Sentencing Guidelines provides that, upon the motion of a defendant pursuant to Section 3582(c)(1)(A), the Court may reduce a defendant's term of imprisonment if, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," the court determines that: (1) "[e]xtraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community"; and (3) "[t]he reduction is consistent with this policy statement." Section 1B1.13(b) lists circumstances that, alone or in combination, may be considered "extraordinary and compelling"

5

for the purpose of a motion pursuant to Section 3582, including a defendant's age, family circumstances, and rehabilitation. The Guideline specifically provides that:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law . . . may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6).

In resolving a compassionate release motion, district courts are permitted to consider whether the relative harshness of a sentence constitutes an "extraordinary and compelling reason" favoring release. *See Brooker*, 976 F.3d at 237 (rejecting district court's holding that excessive length of a sentence "cannot qualify as an extraordinary and compelling circumstance" under Section 3582(c)(1)(A)). "[T]he First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act." *Concepcion v. United States*, 597 U.S. 481, 500 (2022). Indeed, courts in this Circuit have found that where a change in the applicable sentencing law would result in a lower sentence, that development can constitute an "extraordinary and compelling reason" justifying a sentence reduction under Section 3582(c)(1)(A). *See, e.g.*, *United States v. Carlton*, No. 05-cr-796, 2022 WL 17104061, at *5 (E.D.N.Y. Nov. 22, 2022) (finding that a 50-year sentence was "unusually severe" after considering changes in the applicable Guidelines and, among other factors, that the defendant was only 28 at the time he committed the offense and the fact that no weapon was fired).

## DISCUSSION

The Court first concludes that even if Defendant has not exhausted his administrative

remedies, the Government has forfeited any defense on this basis. Next, the Court determines that extraordinary and compelling reasons warrant a reduction in Defendant's sentence. The Court also confirms that such a reduction is consistent with Guidelines Section 1B1.13, the applicable policy statement issued by the Sentencing Commission. Finally, the Court finds that the Section 3553(a) factors support a sentence reduction.

## I.  Administrative Exhaustion

After receiving Plaintiff's petition, the warden took more than 30 days to respond. *See* ECF No. 111-1 at 3–14; 16–18. Some courts have held that such delay alone is sufficient to satisfy the statutory exhaustion requirement. *See, e.g.*, *United States v. Haney*, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020). In any case, here, the Government does not assert failure to exhaust as a defense. It has therefore forfeited the argument. *See United States v. Beckett*, No. 20-cr-213, 2022 WL 2819075, at *3 (E.D.N.Y. July 19, 2022). Because exhaustion is not a jurisdictional prerequisite, the Court may therefore proceed to the merits of Defendant's motion. *See United States v. Saladino*, 7 F.4th 120, 124 (2d Cir. 2021).

## II.  Extraordinary and Compelling Reasons Warrant a Sentence Reduction

### A. Sentencing Disparity

In his *pro se* motion, Defendant advances several bases for a reduction in his sentence. As summarized by the Government, they include "(i) changes in the [Sentencing Guidelines] since the defendant's conviction; (ii) a disagreement with the Court's determination of drug weight at sentencing; (iii) . . . the threat that COVID-19 poses [to] his health; (iv) comparison to sentences of other offenders sentenced at other times; and (v) the Section 3553(a) sentencing factors." ECF No. 121 at 7. Aided by counsel, he focuses on the length of his sentence, which he characterizes as so excessive as to create an "undeniable disparity" with similar defendants. ECF No. 122 at 7. He further identifies significant changes in the law that he argues render his

7

sentence "more and more out of step with the times." *Id.* at 8.

First, Defendant points to New York's recently enacted Raise the Age legislation ("RTA"), *id.*, which provides that "any sixteen-year-old charged with a crime in New York State is to be prosecuted as an [adolescent offender]" and created a "presumption" that "most" felony cases involving such offenders will proceed in Family Court, *see People v. B.H.*, 89 N.Y.S.3d 855, 857–58 (N.Y. Cnty. Ct. 2018) (citing N.Y. Crim. Proc. Law § 722.23(1)). Defendant believes that, as a 16-year-old adolescent offender today, it is "inconceivable" that he would receive a felony conviction for armed robbery, in turn allowing him to avoid the career offender enhancement and corresponding increase in sentencing exposure. ECF No. 122 at 8–9.

Next, Defendant highlights the seminal decision of *United States v. Booker*, 543 U.S. 220 (2005), in which the Supreme Court "eliminat[ed] the requirement that the Sentencing Guidelines be applied in a compulsory manner." *United States v. Fagans*, 406 F.3d 138, 140 (2d Cir. 2005). Defendant argues that post-*Booker*, courts have exercised their discretion to impose below-Guidelines sentences and, in particular, to decline to impose Guidelines sentences under the career offender provision. *See* ECF No. 122 at 9. Defendant points to data from the Sentencing Commission showing that in Fiscal Year 2022, only around 2% of federal defendants were deemed career offenders, and of that group, only 45.2% were sentenced under the Guidelines without a variance, and just 44.7% of that subset received a Guidelines sentence without a departure. *See* U.S. Sent'g Comm'n, QuickFacts: Career Offenders 1–2 (2023), https://perma.cc/K6M6-57U6. Put differently, roughly 273 federal defendants nationwide received a Guidelines sentence pursuant to the career offender provision. ECF No. 122 at 9.[4]

---

[4] The data from Fiscal Year 2023 confirm this pattern. 1,351 of 64,124 federal defendants were career offenders. 42.7% were sentenced under the Guidelines without a variance and of

8

According to Defendant, "[t]he combination of *Booker*, the passage of time, a more nuanced understanding of crime and punishment, and other retroactive changes of law mean that life sentences on non-homicides have become, appropriately, vanishingly rare." *Id.* He observes that in 2023, the nationwide mean sentence length for drug trafficking was 82 months. *See* U.S. Sent'g Comm'n, 2023 Sourcebook of Federal Sentencing Statistics ("2023 Sourcebook"), at tbl. 15 (2024), https://perma.cc/ZD8V-UN4H. He also supports his claim with data from this District.[5] From Fiscal Year 2015 to Fiscal Year 2023, 20 career offenders were sentenced here for heroin offenses under the primary Guideline Section 2D1.1. *See Interactive Data Analyzer*, U.S. Sent'g Comm'n, *available at* https://ida.ussc.gov/analytics (last accessed May 28, 2024). Half of those sentences were between five and ten years, and none exceeded 20 years. *See id.*[6] He argues that this decline has been driven by developments in the Government's charging policies as well as Amendment 782, which changed how the base offense levels in the Guidelines' Drug Quantity Table incorporated the statutory mandatory minimum penalties for such offenses. *See* ECF No. 122 at 11.

The Court agrees that the disparity in this case constitutes an extraordinary and compelling reason to grant Defendant's motion. To be sure, some of Defendant's argument concerning the causes of the disparity is speculative. For example, the Court does not find it "inconceivable" that New York would not today pursue his underlying armed robbery case as an

---

those, 47.4% received a Guidelines sentence without a departure. *See* U.S. Sent'g Comm'n, QuickFacts: Career Offenders 1–2 (2024), https://perma.cc/N2TV-DGS8.

[5]   Defendant cites data only through Fiscal Year 2022, but the Court references the more complete data now available. *See* ECF No. 122 at 10.

[6]   Even when the career offender status limiter is removed and the number of cases significantly expands to 385, the data show that only 1.3% of defendants received sentences exceeding 20 years.

9

adult. New York's RTA, for example, specifically provides for prosecution as an adult where the 16-year-old displays a firearm while carrying out a violent offense. *See* N.Y. Crim. Proc. Law § 722.23(2)(c)(ii). Nevertheless, the Court appreciates Defendant's argument that his wrongful conduct as a teenager led directly to the application of the career offender provision on the federal charges. As Judge Chin observed last year, there is now "increased judicial sensitivity, driven by substantial research, to the role that a criminal defendant's adolescence should play in sentencing." *See United States v. Snype*, 683 F. Supp. 3d 351, 360 (S.D.N.Y. 2023). Indeed, in this case, Defendant's conviction for conduct he engaged in at age 16, while very serious, had a dramatic and cascading effect on his sentence on the instant drug charges, rendering the sentence imposed under the Guidelines "exceptionally harsh." *See id.*

That sentence, legally imposed, was largely a product of the mandatory Guidelines, which sharply curtailed the sentencing court's authority to impose a shorter sentence, regardless of the defendant's unique circumstances. *See United States v. Russo*, 643 F. Supp. 3d 325, 333–34 (E.D.N.Y. 2022) (explaining that post-*Booker*, sentencing courts can "more meaningfully account for" sentencing factors beyond the Guidelines range). Today, the harshness of Defendant's sentence stands in opposition to contemporary practice and creates a significant sentencing disparity relative to similarly situated defendants such that "[n]o reasonable observer could dispute the unfairness and excessiveness of the sentence [he] is serving" on the drug counts. *See United States v. Haynes*, 456 F. Supp. 3d 496, 506 (E.D.N.Y. 2020); *see also United States v. Vargas*, 502 F. Supp. 3d 820, 826 (S.D.N.Y. 2020) (collecting cases and explaining that "numerous defendants facing sentences imposed under mandatory Sentencing Guidelines or other since-invalidated laws or practices have been granted compassionate release at least in part based on the perceived unfairness of their original sentences").

On the facts of this case, the imposition of life sentences for the drug counts is excessive in absolute and comparative terms, as illustrated by the data discussed above. *See Haynes*, 456 F. Supp. 3d at 506; *see also United States v. Torres*, 464 F. Supp. 3d 651, 658–59 (S.D.N.Y. 2020) (finding meritorious defendants' argument that "leaders of major drug trafficking organizations . . . have received far lower sentences than life without parole"). As in *Snype*, the 33 years Defendant has served exceed the length of the average and median nationwide sentences for the crimes associated with the longest sentences: murder, sexual abuse, and kidnapping. 683 F. Supp. 3d at 366.[7] And importantly, the Government "does not oppose the defendant's motion in light of the disparity of sentences between the defendant's current sentence and those of similarly charged individuals today," noting that Defendant received multiple life sentences "for a non-violent drug crime and has already served more than thirty years incarcerated." ECF No. 121 at 7. Thus, there is an extraordinary and compelling reason to grant Defendant's motion.

### B. Rehabilitation

Although rehabilitation "alone" does not constitute an extraordinary and compelling reason to reduce a sentence, "courts may consider it as a factor in determining if there are extraordinary and compelling reasons for compassionate release." *United States v. Qadar*, No. 00-cr-604, 2021 WL 3087956, at *10 (E.D.N.Y. July 22, 2021). What constitutes rehabilitation is left to the Court's discretion, but courts in this district have considered the following factors: the defendant's "maintenance of familial and societal relationships; letters of support both from community members and prison staff; conduct and disciplinary records while incarcerated; . . .

---

[7] In Fiscal Year 2023, the mean and median sentences were 285 and 276 months for murder, 213 and 180 months for sexual abuse, and 199 and 168 months for kidnapping. *See* 2023 Sourcebook at tbl. 15.

11

any achievements and education obtained while incarcerated; . . . . gains in maturity[;] and other clear signs that a defendant's incarceration has had rehabilitative value." *See United States v. Byam*, No. 12-cr-56, 2024 WL 1556741, at *7 (E.D.N.Y. Apr. 10, 2024).

Based on Defendant's submission, the Court is convinced that he has undergone significant rehabilitation. He acknowledges that his "crimes were wrong and inexcusable." ECF No. 122 at 7. During his time in prison, he earned a GED, completed additional coursework, and has shown an interest in the law. *Id.* at 13–14. His prison disciplinary record generally reflects good conduct. He has had no infractions since December 2017, and his last serious infraction, for possessing a dangerous weapon, was in 2007. *Id.* at 24. Although the Court finds such conduct troubling, it appears aberrational in view of his entire record, with his case manager noting that he "stays to himself . . . and works on his case." *See id.* at 23; *see also United States v. Sessoms*, 565 F. Supp. 3d 325, 328 (E.D.N.Y. 2021) (alleged weapons infraction "d[id] not detract from . . . overall performance as an inmate"). His record reflects positive personal growth despite the serious challenges presented by many years of life in the difficult environment of prison.

It is also clear from the record that Defendant has made genuine efforts to remain connected to his supportive and engaged family. Defendant's son, Anthony Delgado, explains that although his father's life was "ruined" by crime, Defendant "encouraged [him] to be a good man and not allow [him]self to get mixed up" in criminality. ECF No. 119 at 29.[8] Significantly, Mr. Delgado, a self-employed entrepreneur who assisted with volunteer efforts in Puerto Rico

---

[8] At the May 28, 2024, conference, the Court permitted the defense to maintain the letters from Defendant's family, which contain certain personal and identification information, under seal. *See, e.g.*, *United States v. Lisi*, 440 F. Supp. 3d 246, 247 n.1 (S.D.N.Y. 2020); *United States v. Vendetti*, No. 10-cr-360, 2024 WL 338991, at *2 (W.D.N.Y. Jan. 30, 2024).

following Hurricane Maria, assures the Court that his father remains in regular contact with him, and that he will provide for his father upon his exit from prison. *See id.* at 28–29. Mr. Delgado's mother, Gioia Delgado, Defendant's wife from whom he is separated, states that Defendant has positively contributed to raising her children, "encourag[ing] [them] to stay in school, to avoid drugs and crime and to generally live a law[-]abiding life." *Id.* at 33. Another son, Keith Cebollero, describes the positive relationship he has maintained with Defendant despite his father's incarceration. *See id.* at 31. Like Mr. Delgado, Mr. Cebollero, now a New York City firefighter, emphasizes that his father gave him "good advice and impressed upon [him] the importance of staying out of trouble," and provided him with valuable lessons for raising his own children. *See id.* In combination with additional letters from his family, it is clear to the Court that Defendant will exit prison supported by a caring family prepared to assist him in living a law-abiding life. Accordingly, there are extraordinary and compelling reasons for a sentence reduction in this case.

### III.   Applicable Policy Statements Issued by the Sentencing Commission

Section 3582(c)(1)(A) provides that any reduction in a defendant's sentence must be "consistent with applicable policy statements issued by the Sentencing Commission." A sentence reduction is consistent with the applicable policy statement, Section 1B1.13, "if, in addition to the existence of . . . extraordinary and compelling reason[s], the defendant is not a danger to the safety of any other person or to the community." *United States v. Donato*, No. 95-cr-223, 2024 WL 1513646, at *10 (E.D.N.Y. Apr. 8, 2024). Because the Court has already considered the guidance set forth in Section 1B1.13 in determining that extraordinary and compelling reasons warrant a reduction in Defendant's sentence, the Court now turns to whether Defendant is a danger to the safety of any other person or to the community.

13

The Government does not contend that Defendant remains a danger to anyone's safety. Although Defendant's crimes were serious, they took place decades ago, and there is no evidence to suggest that he is currently violent. Based on his significant rehabilitation, which the Court has already outlined, the Court sees no reason to conclude that Defendant poses a danger to the safety of another or the community and therefore finds that a reduction in his sentence is consistent with Section 1B1.13. *See, e.g.*, *Haynes*, 456 F. Supp. 3d at 517 (concluding that a defendant who had committed violent crimes did not pose a continued risk to the community because he had been a good prisoner, completed significant coursework while incarcerated, and discharged his job duties impressively).

## IV.   Section 3553(a) Factors

Although Defendant has demonstrated extraordinary and compelling reasons warranting a reduction of his sentence, the Court must still consider whether any such reduction in his sentence is consistent with the Section 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A). "Many of the applicable [Section] 3553(a) factors are incorporated in the Court's discussion of extraordinary and compelling circumstances." *United States v. Campbell*, 647 F. Supp. 3d 76, 89 (E.D.N.Y. 2022). The Court has already considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to protect the public from further crimes of the defendant; (3) the pertinent policy statement issued by the Sentencing Commission; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. In considering these factors, the Court has concluded that they are consistent with granting a reduction in Defendant's sentence.

The Court now considers the remaining Section 3553(a) factors and concludes that they are also consistent with reducing Defendant's sentence.[9] Defendant has already been incarcerated for most of his life and a sentence of time served on the drug charges is sufficient for the purposes of both general and specific deterrence. For the reasons already explained, the Court believes that at 33 years, Defendant has already served a longer sentence than would be imposed today under the same circumstances. Defendant has already taken advantage of educational and vocational training while incarcerated and spending the rest of his life in prison will not advance any additional correctional objectives. *See, e.g.*, ECF No. 122 at 13 (describing these activities). Defendant was not ordered to pay restitution and the Government has not made any argument regarding restitution owed to victims.

Finally, the Court has considered the kinds of sentence and the sentencing range established for the applicable category of offense and defendant as set forth in the Guidelines. Setting aside Defendant's arguments regarding the initial calculation of his criminal history category and any intervening changes of law that would have reduced his Guidelines range, Defendant would still face a Guidelines range of 360 months to life today. *See* U.S.S.G. ch. 5, pt. A. However, as previously discussed, the Sentencing Guidelines are no longer mandatory. *See Carlton*, 2022 WL 17104061, at *5 (collecting cases). And the Second Circuit has made clear that, even in cases involving the career offender guideline, sentencing courts are not deprived of the authority "to impose on a career offender a prison term that is not near the

---

[9] The remaining Section 3553(a) factors call for the Court to consider: (1) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (2) the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the need to provide restitution to any victims of the offense; (4) the kinds of sentences available; and (5) the kinds of sentence and the sentencing range established for the applicable category of offense and defendant as set forth in the Guidelines.

15

statutory maximum." *See United States v. Sanchez*, 517 F.3d 651, 664–65 (2d Cir. 2008) (interpreting 28 U.S.C. § 994(h)).  Accordingly, sentencing Defendant to time served on the three drug counts is consistent with the Section 3553(a) factors.

### V.   Supervised Release and Additional Considerations

In addition to reducing a term of imprisonment, the Court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." *See* 18 U.S.C. § 3582(c)(1)(A).  In imposing three life sentences, Judge Johnson did not initially sentence Defendant to a supervised release term.  *See* ECF No. 44.  Defendant acknowledges that supervised release is appropriate in this case.  *See, e.g.*, ECF No. 122 at 20.  Having considered the Section 3553(a) factors specified by 18 U.S.C. § 3583(c), the Court sentences Defendant to a two-year term of supervised release.  *See United States v. McPherson*, No. 13-cr-362, 2023 WL 8355358, at *4–6 (S.D.N.Y. Dec. 1, 2023) (applying Section 3583(c) in this context).  Defendant shall abide by the mandatory and standard conditions of supervised release reflected in the amended judgment, which will issue following the filing of this Order.  *See* 18 U.S.C. § 3583(d).  There shall be no special conditions.  As discussed at the May 28, 2024, conference, Defendant does not object to this term of supervised release, which the Court believes is needed for Defendant to "reenter society and be in a position to lead a law-abiding life."  *See McPherson*, 2023 WL 8355358, at *6.

Also, as discussed at the May 28, 2024, conference, Defendant has expressed an intention to relocate to Puerto Rico to live with his family.  He shall be permitted to do so.[10]

---

[10]   In view of the foregoing, and as discussed at the May 28, 2024, conference, the Government's request for an updated PSR and additional briefing on resentencing is denied as unnecessary.

16

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's unopposed motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A).  For the reasons explained herein, Defendant is sentenced to time served on Counts One, Two, and Three.  The Court does not reduce Defendant's concurrent 120-month term on Count Four for witness tampering, but Defendant has now long served his sentence on that count and it remains concurrent to Counts One, Two, and Three.  Defendant is also sentenced to a two-year term of supervised release and shall abide by the mandatory and standard conditions of supervised release reflected in the amended judgment.  An amended judgment shall issue.

For the avoidance of doubt, Defendant shall be promptly released from custody.  This Order shall remain STAYED for up to seven days following the issuance of an amended judgment for verification of Defendant's residence, establishment of a release plan, and to make appropriate travel arrangements.  There shall be no delay in ensuring travel arrangements are made.  If more than seven days are needed to make these preparations, the parties shall immediately notify the Court and show cause why the stay should be extended.

SO ORDERED.

                                                */s/ Hector Gonzalez*
                                                HECTOR GONZALEZ
                                                United States District Judge

Dated: Brooklyn, New York
       May 28, 2024